UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

MOHAMMED BHUIYAN,

                          Plaintiff,                          9:06-CV-409 (ATB)

        v.

CORRECTIONAL OFFICER WRIGHT, et al.,

                          Defendants

_____

EMILY M.D. BROWN, ESQ., for Plaintiff
TIMOTHY P. MULVEY, Assistant Attorney General, for Defendants

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

**MEMORANDUM-DECISION AND ORDER**

Plaintiff commenced this civil rights action under 42 U.S.C. § 1983, alleging that, while he was confined at the Auburn Correctional Facility on April 20, 2003, the defendant correction officers assaulted him and/or failed to intervene to protect him, violating his right to be free from cruel and unusual punishment under the Eighth Amendment and his right to Equal Protection under the Fourteenth Amendment. On March 24, 2011, with the consent of the parties, this matter was referred to me for all further proceedings, including the entry of final judgment, by the Hon. Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73. (Dkt. No. 92). This court conducted a bench trial in Syracuse,

New York, on May 9 and 10, 2011.  Having considered all of the testimony and evidence admitted at trial, the court finds in favor of the defendants on all claims brought against them.  The following constitutes the court's supporting findings of fact and conclusions of law, as required by FED. R. CIV. P. 52.

## I.    FINDINGS OF FACT

### A.    Stipulated Facts[1]

The parties stipulated that plaintiff Mohammed Bhuiyan (hereinafter "plaintiff" or "Bhuiyan") was an inmate in the custody of the New York Department of Correctional Services ("DOCS"), at Auburn Correctional Facility ("Auburn") in 2003. On April 20, 2003, defendants Wright, Kuc, and Davis were correction officers at Auburn.  Defendants Koziol and Withers were sergeants at Auburn at that time.

At approximately 8:45 p.m. on April 20, 2003, plaintiff was crossing from the North Recreation Yard to the South Recreation Yard at Auburn prison.  He was stopped by one or more corrections officers.  At some point while he was still in the prison yard, handcuffs were placed on plaintiff, while defendants Wright and Koziol were present.  Defendant Wright and Koziol escorted plaintiff from the recreation yard to his cell block.  The plaintiff was subjected to at least one "pat frisk"; no contraband was found on his person.

Photographs were taken of Bhuiyan on April 21, 2003.  Plaintiff was seen by Nurse Quinn in the Auburn infirmary that afternoon, at approximately 3:40 p.m. Plaintiff's medical records verify that he sought medical attention for a wide range of

---

[1] The stipulations of the parties are set forth in Dkt. No. 105.

complaints, including back pain, both before and after April 20, 2003.

### B.      Plaintiff's Version of Disputed Facts

Mohammed Bhuiyan is an Indian, originally from Bangladesh.  His first language is Bangla, and he is a practicing Muslim.  Plaintiff testified that correction officers at Auburn, including all of the named defendants, periodically referred to him as a "terrorist" and harassed him in other ways because of his ethnicity and religion. In April 2002, plaintiff filed a grievance complaining of such harassment by correction officers other than the defendants.  He claimed that, in response to the grievance, defendant Withers cursed and threatened plaintiff with a beating if he filed any other such grievances.  (Pl.'s Exh. 17).

A correction officer not named in this complaint charged plaintiff, in an inmate misbehavior report filed in December 2002, with possessing terrorist or gang-related material in his cell.  Plaintiff was vindicated on this charge when the confiscated letter proved to be a letter from his mother, written in Bangla.  Bhuiyan claimed that defendant Davis was involved in the cell search that prompted this disciplinary charge, and burned plaintiff's beard with a lighter during the incident.  C.O. Davis' name was not reflected in the misbehavior report.  (Pl.'s Exh. 19).

Plaintiff testified that, at about 5:30 p.m. on April 21, 2003, defendant Wright came to his cell, mentioned his prior grievances against other correction officers, called him a "terrorist," and threatened to beat and kill plaintiff.  As plaintiff acknowledged, these allegations were not included in the written grievance he filed a few days later about the alleged incidents on April 21st.

As plaintiff was crossing through the tunnel between the north and south recreation yards during the evening of April 20, 2003, defendant Wright ordered Bhuiyan to submit to a pat frisk.  Plaintiff claimed that he obeyed the directions given by C.O. Wright; however, he admitted being upset (but not crying) and asking why the officers were mistreating him.  According to the plaintiff, numerous officers surrounded him, someone kicked his feet to move them further from the wall against which he was told to stand, an officer took his identification and his cigarettes from him, and eventually he was placed in handcuffs, with his hands behind his back.  Plaintiff testified that defendant Withers was in the area and directed defendants Koziol and Wright not to do anything "here" and to take the plaintiff back to his cell block.

Defendants Wright and Koziol escorted plaintiff, in handcuffs, to the "feed-up room" on the upper floor of the cell block where plaintiff was confined.  Once in this small room, plaintiff testified that defendant Koziol punched him twice in the chest.  Defendant Koziol then allegedly directed defendant Wright to beat plaintiff further.  According to plaintiff, defendant Wright punched him once in the face, drawing blood from around plaintiff's right eye.  Sgt. Koziol wiped the blood from plaintiff's face using his "kufi,"[2] and cautioned C.O. Wright to hit plaintiff where it would leave no marks.  Defendant Wright proceeded to repeatedly hit and kick plaintiff in his body, causing him to fall to the floor and hit two front teeth on the ground.  When plaintiff

---

[2] Plaintiff testified that the kufi worn on his head has religious significance in the Muslim faith.

4

screamed, C.O. Wright tightened the strings of the hood on plaintiff's sweat shirt in an effort to silence him.

Defendant Koziol brought the plaintiff up to his feet, at which time Bhuiyan first saw defendants Kuc and Davis on the other side of the door to the feed-up room, allegedly keeping watch. Defendant Koziol then purportedly warned plaintiff not to tell anyone about the incident or they would bury him under the jail and/or charge him with assaulting an officer. When plaintiff did not respond to defendant Koziol, defendant Kuc allegedly pulled on plaintiff's beard and told him to answer the sergeant. Plaintiff was then released and allowed to return to his cell. He testified that defendant Davis made threatening and racist remarks such as "haven't you killed the terrorist yet" as plaintiff was moving towards his cell.

Plaintiff testified that other inmates gave him ice to put on his right eye and that he experienced serious back and neck pain. The next morning, he asked to be taken to emergency sick call, but was refused. Plaintiff testified that he did not see any medical personnel until about 3:30 p.m. on April 21, 2003, when he was taken to the prison infirmary and examined by Nurse Quinn. He filed a written grievance about the incident a few days later. (Pl.'s Exh. 5).

Plaintiff testified that, in the years following this incident, he continued to suffer from back pain that was more persistent and serious than the occasional back pain of which he complained prior to April 2003.[3] Plaintiff suggested that the root

---

[3] Plaintiff did not contest that his medical records documented complaints of back pain on approximately seven prior occasions in 2002. (Defs.' Exh. 16).

5

canal he had on two front teeth in 2008 related to his hitting those teeth on the floor during the 2003 incident.[4]

### C.    Defendants' Version of Disputed Facts

All of the named defendants, as well as Lt. Michael Ouimette, Lt. William Estabrook, and Nurse Kristen Quinn testified in the defense case.  Each witness had considerable experience on the staff at the Auburn facility.  All of the named defendants denied that they threatened or harassed plaintiff as alleged, or made derogatory comments to him relating to his race, ethnicity, or religion.

Although the DOCS directive governing searches for contraband does not explicitly discuss "random" pat frisks, it does allow discretionary pat frisks of inmates en route to and from recreation areas.  (Pl.'s Exh. 26 at 2).  Lt. Ouimette, Lt. Estabrook, and defendant Koziol (now also a lieutenant), among others, testified that random pat frisks of inmates in the tunnel between the north and south yard recreation areas at Auburn (often referred to as the "arch gate") were a routine and approved practice of the security staff to try to intercept contraband frequently found on inmates.

Defendant Wright denied having any contact with plaintiff on April 20, 2003, before C.O. Wright stopped Bhuiyan for a pat frisk near the arch gate at around 8:30 p.m.  Defendant Wright testified that, during the evening of April 20th, he would have

---

[4]Dental records confirmed that DOCS dentists first noted that plaintiff would require the root canals in February 2007.  The records indicate that plaintiff advised the dentist at that time about a fall in July 2006.  (Pl.'s Exh. 23).  Plaintiff was recalled to testify that the dentist misunderstood what Bhuiyan said.  Plaintiff's other medical records do not refer to a fall or injury to his teeth in 2006.

selected plaintiff for a pat frisk as he passed through the tunnel between the north and south yards because something about Bhuiyan's conduct or demeanor made him suspicious.  C.O. Wright testified that he could not recall what initially drew his attention to plaintiff, but the fact that he questioned why he was being frisked reinforced Wright's suspicion that plaintiff might be carrying contraband.

Defendant Koziol was observing inmate movements in the area at that time, and saw plaintiff's interaction with defendant Wright.  Sgt. Koziol concluded, from the way plaintiff was gesturing, that Bhuiyan was being argumentative and/or uncooperative with C.O. Wright.  Defendant Koziol walked towards plaintiff and ordered him to put his hands on the wall for a pat frisk.  Because plaintiff continued to be argumentative, defendant Koziol decided that Bhuiyan should be removed from the area, to avoid any escalation of the incident.   Plaintiff was handcuffed behind the back while his hands were on, or moving towards, the wall, and defendants Wright and Koziol escorted plaintiff towards his cell block.  Sgt. Koziol and C.O. Wright both believed that a pat frisk of the plaintiff was not conducted while he was in the yard.  Neither officer recalled any interaction with Sgt. Withers in connection with the incident involving plaintiff in the yard.

Defendant Withers testified that he now recalled nothing about the interaction between defendants Koziol and Wright with the plaintiff in the yard.  Sgt. Withers' report on the incident, dated May 1, 2003 (Defs.' Exh. 9), stated he was in the general area during the incident in the yard, but did not have any verbal interaction with the plaintiff.  Defendant Withers stated that it is possible he would have told then-Sgt.

Koziol to remove plaintiff from the yard, which at that time contained numerous other inmates.  However, he stated any such instruction would have been motivated by a desire to avoid any escalation of the incident, and was not an implicit instruction for any officer to assault the plaintiff.[5]

Defendants Koziol and Wright both testified that, as they escorted plaintiff to a landing area on the upper floor of his cell block, he started crying uncontrollably.  Once on the landing, plaintiff's handcuffs were removed and he was pat frisked by C.O. Wright.  No contraband was found.  Sgt. Koziol testified that he was concerned about plaintiff's distraught emotional state, and took him into the small feed-up room to try to determine what was upsetting him.  Defendant Koziol testified that he advised plaintiff that he could return to his cell with no disciplinary repercussions, and that plaintiff thereafter started to calm down.[6]  Plaintiff was then allowed to return to his cell without incident.

Defendants Koziol and Wright both denied striking or assaulting plaintiff.  They

---

[5] On cross-examination, defendant Withers was asked about his comments that plaintiff made numerous complaints and was prone to exaggeration.  Defendant Withers could not recall any specific incidents involving plaintiff.  However, he testified that, if plaintiff had accused him of cursing and threatening plaintiff in connection with a prior grievance (as plaintiff claimed in May 2002, as documented in Pl.'s Exh. 17), that would be an example of plaintiff's exaggerations.

[6] Defendant Koziol testified that it was within his discretion to issue a misbehavior report to plaintiff for initially failing to cooperate with the ordered pat frisk in the yard; but he decided to try to resolve the incident without disciplinary charges.  During cross examination, plaintiff's counsel highlighted that defendant Koziol's answer to an interrogatory (Pl.'s Exh. 11 at 3) stated that he was unaware of any rule violation by plaintiff that evening.  Sgt. Koziol's contemporaneous report on the incident (Defs.' Exh. 5) did note that plaintiff was uncooperative during the attempted pat frisk in the yard.  C.O. Wright's contemporaneous report (Defs.' Exh. 8), did not discuss events in the yard, but focused on plaintiff's allegations of what occurred later in the cell block.

stated that, because the feed-up room was very small and contained shelves and perhaps a desk and a chair or two, there was insufficient space for three persons, much less enough room to carry out the alleged assault which plaintiff described. Defendants Wright and Koziol did not recall seeing defendants Kuc or Davis in the landing area during their interaction with plaintiff.

C.O. Kuc testified that he had no specific recollection of seeing plaintiff during the evening of April 20, 2003, and he did not witness any assault of an inmate on that date. Defendant Kuc's contemporaneous report, in response to plaintiff's grievance, stated that, starting at 8:40 p.m. on April 20th, he was relieving officers at the gates on either end of the tunnel between the north and south yards, and thus would not have been on the top floor of plaintiff's cell block at the time he was allegedly keeping watch over the alleged assault of the plaintiff.

Defendant Davis was assigned to work on a lower floor of plaintiff's cell block during the 3:00 to 11:00 p.m. shift on April 20, 2003, and he did not recall seeing any of the defendants in plaintiff's presence that evening. Both during his testimony and his contemporaneous report (Defs.' Exh. 7), C.O. Davis denied witnessing any inmate assault on April 20th. Defendant Davis testified that he never called plaintiff a "terrorist," and he denied being present during the December 20, 2002 cell search when another officer accused plaintiff of possessing suspected terrorist material in his cell.

Retired Lt. Estabrook testified that he was the 3:00 to 11:00 p.m. shift commander at Auburn. When he reported for work on April 21, 2003, he was

instructed by the Deputy Superintendent for Security to investigate an allegation of assault that plaintiff had made to a doctor in the Auburn infirmary earlier that day.  Lt. Estabrook had the plaintiff escorted to the infirmary, where he took photographs of the plaintiff in his boxer shorts as he was examined by Nurse Quinn.  He thereafter interviewed plaintiff about the alleged incident, and he directed all the officers allegedly involved to submit reports.[7]  Lt. Estabrook eventually submitted reports regarding his investigation of the incident to two superior officers at Auburn.  (Defs.' Exhs. 10, 11).

Nurse Quinn testified that, at about 3:30 p.m. on April 21, 2003, she conducted a head-to-toe medical assessment of plaintiff.  She observed and documented a slight abrasion to plaintiff's right eyelid and some swelling in that area.  Plaintiff complained of no other injuries, and Nurse Quinn did not find evidence of any other injuries.  The photographs taken of plaintiff in his shorts that afternoon (Defs.' Exh. 13), are consistent with Nurse Quinn's observations.

Nurse Quinn examined the plaintiff's medical records from April 21, 2003, noting two prior entries that day.  (Defs.' Exh. 16; Pl.'s Exh. 21 at p. 2 & Exh. 22).[8] Plaintiff's Ambulatory Health Record indicates that he was seen by Nurse John

---

[7] As plaintiff's counsel raised at several points during cross-examinations and summation, Lt. Estabrook directed Sgt. Koziol to gather reports from the correction officers who were subordinate to him, even though Sgt. Koziol was implicated in the alleged assault. (Defs.' Exhs. 6-8). Lt. Estabrook thereafter interviewed all of those officers and conducted the investigation himself. Sgt. Koziol, Sgt. Withers, and Nurse Quinn submitted their reports directly to Lt. Estabrook. (Defs.' Exhs. 4, 5, 9).

[8] The parties stipulated to a typed transcript of the original handwritten Ambulatory Health Records for that day. (Pl.'s Exh. 22; Dkt. No. 105 ¶ 2).

MacClellam at about 8:50 a.m. on the morning after the alleged assault. The plaintiff complained of general aches and pains and abrasions to his right eyelid, but there is no mention of a claim that plaintiff was assaulted. Nurse MacClellam found no evidence of bruising or swelling on plaintiff's upper body or arms.

Plaintiff had a previously-scheduled appointment with Dr. Graceffo at the infirmary later on April 21st. Dr. Graceffo's notes, which do not reflect the time of his examination, indicate that plaintiff complained of being hit in the chest and eye by security. The doctor noted swelling to plaintiff's right eye lid and, at plaintiff's request, ordered x-rays, which showed no rib fractures.

### D.    Court's Findings of Fact

After considering all of the testimony, the credibility of the witnesses, and the exhibits and other evidence, this court finds that the plaintiff has not established, by a preponderance of the credible evidence, his version of the critical disputed facts. Given the complete lack of corroboration of plaintiff's story, and the inconsistencies between his testimony and other credible evidence, the court finds that Mohammed Bhuiyan was not assaulted by any of the defendants on April 20, 2003, and that the defendants were not motivated by racial, ethnic, or religious animus in their interactions, if any, with plaintiff on that evening.

From the filing of his grievance on April 24, 2003, through his testimony at trial, plaintiff was largely consistent in recounting his version of the events of April 20, 2003, although he could marshal little objective corroboration of his story. The five named defendants were generally consistent, with their prior statements and with

each other, in their adamant denials of plaintiff's allegations of excessive force and discriminatory conduct. Plaintiff's counsel argued that the defendants removed plaintiff to an isolated place without any civilian witnesses, inevitably leaving him in a position where he could rely only on his word against the word of multiple correction officers. However, the plaintiff's testimony was inconsistent with other credible evidence in several significant respects, which caused this court to conclude that he did not sustain his burden of proof with respect to the allegations of excessive force and discrimination.

First, plaintiff claims that he was singled out for a pat frisk and subsequent assault because of his identification as a foreign-born Muslim, in the aftermath of the events of September 11, 2001. However, plaintiff did not marshal any corroboration for his sweeping claim that all of the named defendants were motivated by discriminatory animus in their alleged interactions with him on April 20, 2003. Plaintiff's claims of prior discriminatory remarks or harassment either involved correction officers other than the named defendants, were very general, or were not supported by anything other than his testimony or prior statements. As noted above, all of the defendants specifically denied harassing, threatening, or making derogatory comments about plaintiff based on his race or religion.

Numerous defense witnesses testified that random pat frisks in and around the tunnel between the north and south recreation yards were a commonly-used and approved practice to minimize the transportation of contraband in that busy and high-risk area. Defendant Wright could not recall the particular suspicions that led him to

12

select plaintiff for a pat frisk on the day in question.  However, the plaintiff testified that this was the only occasion on which he was selected for a pat frisk at Auburn; the absence of any pattern of such conduct undermines the suggestion that he was targeted on this single occasion because of his race or religion.

Defendant Koziol testified that he decided to remove plaintiff from the tunnel area in handcuffs because Bhuiyan was uncooperative with an ordered pat frisk, and because Sgt. Koziol wanted to avoid escalation of the incident in the presence of numerous other inmates.  Particularly in light of plaintiff's admission that he was upset, and questioned why he was being subjected to mistreatment in the yard, defendant Koziol presented a persuasive, non-discriminatory reasons for taking plaintiff back to his cell block to complete a pat frisk.  As discussed further below, the court's conclusion that plaintiff's allegations that defendants thereafter assaulted him and otherwise mistreated him were unfounded, vitiate his claims of discriminatory, unfavorable treatment.

Plaintiff failed to sustain his burden of proving that three of the defendants, whom he alleges were involved in the violations of his constitutional rights on April 20, 2003, had any relevant interaction with him on that evening.  Although Sgt. Withers thought it was possible that he advised Sgt. Koziol to remove plaintiff from the tunnel area on the evening in question, neither he, nor defendants Koziol or Wright recalled his involvement in the incident.  Defendant Kuc's contemporaneous report makes a compelling case that he could not have been present to witness the alleged assault of plaintiff in the feed-up room on the top floor of plaintiff's cell block.

Plaintiff Davis was assigned to an entirely different floor of plaintiff's cell block and testified that he did not see any of the defendants in plaintiff's presence on the evening of April 20th.

Most tellingly, plaintiff claims that he was severely beaten and kicked on the evening of April 20, 2003, and he was denied any medical attention until he was seen by Nurse Quinn after 3:30 p.m. the next day. However, DOCS medical records show that plaintiff was in fact seen by a nurse at 8:50 a.m. on April 21st and by Dr. Graceffo before 3:40 p.m. that same day. Plaintiff's counsel attempted to raise questions about the authenticity of the medical records. However, the testimony of Nurse Quinn and the court's review of all of plaintiff's medical records undermine the suggestion that the records were somehow fabricated by DOCS medical staff, who were not involved in the alleged altercation, to counter plaintiff's allegations.[9] Lt. Estabrook testified that, as soon as he arrived on duty as the watch commander at 3:00 p.m. on April 21st, he was told to investigate Bhuiyan's statement to the prison doctor that plaintiff was

---

[9] Plaintiff's counsel noted that the handwriting for the entry of plaintiff's name, inmate number, and the date on the top Ambulatory Health Records for April 21, 2003 was different than the handwriting in the treatment notes. Nurse Quinn explained that, when an inmate had a scheduled appointment with a doctor, as plaintiff did with Dr. Graceffo on April 21st, the staff often filled in the patient's name, inmate number, and the date on the next blank space in that patient's record before the doctor saw the inmate. It is apparent from plaintiff's extensive Ambulatory Health Records that each page contains three blocks for different medical entries, which are completed in date and time order starting at the top of the page. If Nurse Quinn had been the first medical professional at Auburn to see plaintiff on April 21st, she should have put her notes at the top of the page for that date. Instead, Nurse Quinn's notes are in the bottom block of the page, with Nurse MacClellam's entries in the top block on the page, and Dr. Graceffo's entries in the middle of the page. To manipulate those records to create a false impression about who saw plaintiff on this particular date, three different medical professionals would have been required to conspire to do so. The court finds it highly implausible that such a falsification occurred in this case.

assaulted by officers.  That testimony, involving various Auburn officials not

implicated by plaintiff's allegations, further corroborates that plaintiff was indeed

examined by Dr. Graceffo before Nurse Quinn performed her examination.

Finally, the medical examinations of plaintiff indicate that he suffered no

bruising or swelling on his body or limbs, which seems inconsistent with plaintiff's

allegation of being repeatedly punched and kicked in those areas.  Plaintiff's

subjective claims of back and other pain, from the day after the incident and for a

considerable period thereafter, and the need for a root canal on two front teeth many

years later, do not provide sufficient corroboration of plaintiff's claims of injuries

sustained on April 20, 2003.  While the slight abrasion and swelling to plaintiff's right

eye were not explained, that alone is insufficient to meet his burden of proof that he

was the victim of the vicious assault he alleged.

## II.  CONCLUSIONS OF LAW

### A.  Eighth Amendment Claims

#### 1.  Excessive Force

Inmates enjoy Eighth Amendment protection against the use of excessive force,

and may recover damages under 42 U.S.C. § 1983 for a violation of those rights.

*Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  The Eighth Amendment's prohibition

against cruel and unusual punishment precludes the "unnecessary and wanton

infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Sims v. Artuz*, 230

F.3d 14, 20 (2d Cir. 2000).  To sustain a claim of excessive force under the Eighth

Amendment, a plaintiff must establish both objective and subjective elements.  *Blyden*

*v. Mancusi*, 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be "'inconsistent with the contemporary standards of decency.'" *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims*, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id*. (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider:  the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made

16

by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

The court finds that the plaintiff did not sustain his burden of proving that, on April 20, 2003, he was subjected to any excessive or malicious use of force.  Rather, to the extent any force was used on plaintiff during the incident, it was minimal, reasonable, and appropriate to complete a justified security pat frisk on a reluctant inmate.  As discussed above, the court has concluded that the plaintiff did not prove, by a preponderance of the credible evidence, that he was subjected to the gratuitous and malicious punches and kicks purportedly inflicted by defendants Koziol and Wright after plaintiff was removed from the prison yard.  Even if plaintiff had established that the defendants had kicked at plaintiff's feet or had somehow caused the minor abrasion over his right eye, while attempting to carry out the pat frisk,[10] any such use of force would have been *de minimis* and would not support an Eighth Amendment claim.  *See, e.g.*, *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 471 (S.D.N.Y. 1998) (although kicking an inmate's ankles and feet during a pat frisk cannot be condoned, this use of force is *de minimis* and insufficient to rise to the level of a constitutional violation); *Kalwasinski v. Artuz*, 02 CV 2582, 2003 WL 22973420, at *5-7 (S.D.N.Y. Dec. 18, 2003) (the claim that a defendant correction officer pressed an argumentative plaintiff's face into the wall while conducting a pat frisk, causing plaintiff to suffer a sore forehead and left cheek, was a minor use of force to carry out

---

[10] The court does not believe that the plaintiff established, by a preponderance of evidence, even that level of force by the defendants.

17

a necessary prison procedure, not an Eighth Amendment violation); *Anderson v. Sullivan*, 702 F. Supp. 424, 425-27 (S.D.N.Y. 1988) (prison guards allegedly pushed inmate's face into a bar while applying handcuffs, causing temporary swelling; even assuming, as plaintiff claims, that he did not resist, the amount of force was not significantly disproportional to the goal of handcuffing plaintiff).

### 2.    Failure to Intervene

A correction officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate.  *See, e.g., Cicio v. Graham,* No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. March 15, 2010); *Tafari v. McCarthy*, No. 9:07-CV-654 (DNH/GHL), 2010 WL 2044705, at*8  (N.D.N.Y. May 24, 2010).[11]  A law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Id*.[12]  In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force.  *Id.;*

---

[11] *See also Fischl v. Armitage,* 128 F.3d 50, 57 (2d Cir.1997) (reversing grant of summary judgment for defendant based on evidence that defendant was in the vicinity of an assault on plaintiff and failed to intervene)*; Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

[12] *See also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

*Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citation omitted).

Given that the court has found that no defendant applied excessive or malicious force to the plaintiff, a claim that any defendant violated the Eighth Amendment by failing to intervene must also fail.  In any event, the plaintiff did not prove, by a preponderance of credible evidence, that defendants Withers, Kuc, and Davis were present for, or personally involved in, plaintiff's interactions between defendants Koziol and Wright, much less in a reasonable position to intervene.  *See, e.g., Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (personal involvement is a prerequisite to the assessment of damages in a section 1983 case); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

## B.    Equal Protection Claim

Under the Fourteenth Amendment's Equal Protection clause, a plaintiff may be able to recover for a physical assault[13] that would not meet the objective threshold for Eighth Amendment excessive force claims, if the defendant's conduct was motivated

---

[13] While conceding that derogatory or threatening racial or religious comments alone would not establish an Equal Protection claim, plaintiff's counsel argued that "unfavorable" treatment of a plaintiff short of an assault, if motivated by racial or religious animus could support such a claim.  (Pl.'s Trial Brief at 6, Dkt. No. 97 (citing *Abuhouran v. Acker*, 2005 U.S. Dist. LEXIS 12864, *5, 15-16, 2005 WL 1532496 at *4-5 (E.D. Pa. June 29, 2005) (denying dismissal of an Equal Protection claim where an Arab-American inmate alleged that the defendant officer mocked the plaintiff because of his "name, accent, and religion," called him "a little terrorist," and subjected him to harassing conduct and unfavorable treatment)).  While this court does not believe that subjecting an inmate to a single pat frisk under the circumstances of this case could constitute "unfavorable treatment" supporting an Equal Protection claim, I need not reach that issue because I find plaintiff has not proven that the defendants acted with a discriminatory motive or intent.

by racial or religious discrimination.  *See Baskerville v. Mulvaney*, 411 F.3d 45, 49 (2d Cir. 2005) (upholding a jury verdict for defendant corrections officers but noting that "[t]he district court did not disagree with [plaintiff's] legal theory that a corrections officer could push or shove an inmate and such action would not meet the objective threshold of excessive force but might nevertheless be actionable if motivated by racial discrimination or religious retaliation.").  As noted above, the court has concluded that plaintiff did not prove, by a preponderance of the credible evidence, that he was the victim of any assault or that the defendants were motivated by racial or religious discrimination to the extent they interacted with plaintiff on April 20, 2003. Accordingly, the court finds in favor of defendants on plaintiff's Equal Protection claims.

## III.    CONCLUSION

For the reasons discussed above, the court finds in favor of the defendants on all claims brought against them.  Accordingly, it is hereby

**ORDERED**, that the complaint is dismissed with prejudice and the Clerk of the Court is directed to enter judgment in favor of the defendants on all claims.


Dated: May 13, 2011

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

20